1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

10
11

RHONDA JEAN CROCKER,

No.  2:23-CV-2132-DMC

12

Plaintiff,

13

v.

MEMORANDUM OPINION AND ORDER

14

COMMISSIONER OF SOCIAL
SECURITY,

15
16

Defendant.

17
18

Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19

review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20

Pursuant to the written consent of all parties, ECF Nos. 5 and 8, this case is before the

21

undersigned as the presiding judge for all purposes, including entry of final judgment.  See 28

22

U.S.C. § 636(c); see also ECF No. 9 (consent minute order).  Pending before the Court are the

23

parties' briefs on the merits, ECF Nos. 15 and 18.

24

The Court reviews the Commissioner's final decision to determine whether it is:

25

(1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

26

whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

27

more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

28

(9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support

1   a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

2   including both the evidence that supports and detracts from the Commissioner's conclusion, must

3   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

4   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The Court may not affirm the Commissioner's

5   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

6   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

7   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

8   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

9   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

10  which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

11  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

12  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

13  Cir. 1988).

14              For the reasons discussed below, the Commissioner's final decision is affirmed.

15

16                      **I.  THE DISABILITY EVALUATION PROCESS**

17              To achieve uniformity of decisions, the Commissioner employs a five-step

18  sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R. §§

19  404.1520 (a)-(f) and 416.920(a)-(f).   The sequential evaluation proceeds as follows:

20          Step 1       Determination whether the claimant is engaged in
21                       substantial gainful activity; if so, the claimant is presumed
                         not disabled and the claim is denied;

22          Step 2       If the claimant is not engaged in substantial gainful activity,
23                       determination whether the claimant has a severe
                         impairment; if not, the claimant is presumed not disabled
24                       and the claim is denied;

25          Step 3       If the claimant has one or more severe impairments,
                         determination whether any such severe impairment meets
26                       or medically equals an impairment listed in the regulations;
                         if the claimant has such an impairment, the claimant is
27                       presumed disabled and the claim is granted;

28  / / /

                                            2

| | | |
|---|---|---|
| Step 4 | | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months.  See 42 U.S.C. § 1382c(a)(3)(A).  The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989).  The claimant has the initial burden of proving the existence of a disability.  See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work.  See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f).  If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /

/ / /

/ / /

/ / /

1

## II.  THE COMMISSIONER'S FINDINGS

2    Plaintiff applied for social security benefits on April 22, 2021.  See CAR 28.[1]  In

3  the application, Plaintiff claims disability began on December 7, 2020.  See id.  Plaintiff's claim

4  was initially denied.  Following denial of reconsideration, Plaintiff requested an administrative

5  hearing, which was held on June 28, 2022, before Administrative Law Judge (ALJ) Vincent

6  Misenti.  In an August 2, 2022, decision, the ALJ concluded Plaintiff is not disabled based on the

7  following relevant findings:

8
9
   1.    The claimant has the following severe impairment(s): fibromyalgia, back strain, and psoriatic arthritis.

10
11
   2.    The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations.

12
13
14
15
16
   3.    The claimant has the following residual functional capacity: the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift, carry, push, or pull up to 20 pounds occasionally, 10 pounds frequently; she can sit, stand or walk for six hours each in an eight-hour workday; she can frequently reach with the bilateral upper extremities; she can handle items frequently with the bilateral hands; the claimant can climb ramps and stairs frequently, but never climb ladders, ropes, or scaffolds; she can balance, stoop, kneel, crouch and crawl frequently; she can never work at unprotected heights.

17
18
19
   4.    Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

20    See id. at 30-43.

21  After the Appeals Council declined review on July 25, 2023, this appeal followed.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27
---
28  [1]    Citations are to the Certified Administrative Record (CAR) lodged on November 27, 2023, ECF No. 6.

4

1

### III.  DISCUSSION

In her opening brief, Plaintiff argues: (1) the ALJ erred in determining that Plaintiff's mental impairment is not severe; (2) the ALJ erred in evaluating opinion evidence provided by Drs. Wagner and Mitchell; and (3) the ALJ failed to provide sufficient reasons for rejecting her subjective statements and testimony.  See ECF No. 15.

### A.       Severity of Plaintiff's Mental Impairment

To qualify for benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).[2]  In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See Social Security Ruling (SSR) 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient.  See id.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[2]       Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

At Step 2, the ALJ evaluated the severity of Plaintiff's impairments.  See CAR 30-34.  The ALJ considered the limiting effects of the following impairments: (1) fibromyalgia; (2) back strain; (3) psoriatic arthritis; (4) Plaintiff's weight; and (5) depression.  See id.  As to Plaintiff's depression, the ALJ stated:

> Finally, the undersigned finds her alleged depression non-severe. At the hearing, the claimant testified that she takes Lexapro for depression and anxiety. She agrees with the Social Security doctors who said she would have difficulty with the stress of the workplace. She would have panic attacks, as it is hard to be around people. She shakes uncontrollably and shuts down. She cries during the daytime. The overall evidence is inconsistent with the claimant's testimony. The evidence indicates very minimal findings related to a mental impairment, with very little reports of symptoms by the claimant.
>
> On December 24, 2020, the claimant reported that her niece had died (Exhibit 6F, page 25). She said she was her niece's caretaker and that she felt she could not take on another caretaking responsibility and "wants disability." She was crying, and said she was unable to sleep. The impression was bereavement, and diazepam was prescribed.
>
> One week later, at the request of the State Agency, a consultative examination was performed by Dr. Mitchell on January 3, 2021 (Exhibit 1F). She reported a long history of anxiety, with panic attacks while driving on the highway. She had been taking Lexapro since 2018. She has since experienced a couple of panic attacks that were not as severe. Her depression was related to her medical issues, with tiredness, sadness and crying spells. She rarely ventured outside the home and denied socializing. She could not drive on the highway and had anxiety as a passenger. She goes to the store twice a month and can go out to eat with her family depending on the type of day she's having. She last worked in 2020 and could not currently work due to medical symptoms. She said she was independent in activities of daily living and could shower and dress herself. She can prepare meals and drive a vehicle in her neighborhood. She is able use public transportation without supervision. She can shop independently and make change. She cooks dinner and does the laundry. Upon mental status examination, she was well groomed with good hygiene. She was cooperative. Eye contact was good. Speech was normal. She was oriented in all spheres. Attention and concentration were not impaired. Memory was not impaired, abstraction and judgment were intact, and she had good insight. She was noted to be anxious and depressed. Thought processes were linear and logical. It was felt that she may have difficulty managing stress and change in the workplace based on her level of depression and anxiety, and that she was mild to moderately impaired in the ability to complete a normal workday/week without interruptions from a psychiatric condition due to anxiety and depression and her report of being uncomfortable around others.
>
> On January 8, 2021, she was oriented in all spheres with normal mood and affect (Exhibit 2F, page 11). On April 12, 2021, she appeared to be alert and oriented in all spheres (Exhibit 2F, page 4). On June 7, 2021, she was oriented in all spheres with normal mood and affect (Exhibit 4F, page 6).

On August 2, 2021, she was noted to be very pleasant and cooperative, and was able to provide an adequate history (Exhibit 5F).

On August 3, 2021, a PHQ-2 depression screen score was zero (Exhibit 6F, page 11). She denied depression or anxiety. She had good judgment, normal mood and affect, and was alert and oriented in all spheres.

On August 11, 2021, she was oriented in all spheres with normal mood and affect (Exhibit 7F, page 12). On August 24, 2021, a depression screening test was negative (Exhibit 6F, page 11). She had good judgment, normal mood, normal affect, and was alert and oriented in all spheres.

On October 20, 2021, December 14, 2021, February 23, 2022, April 25, 2022, she was oriented in all spheres with normal mood and affect (Exhibit 7F, page 4; 9F, page 6, 13, 17; 10F, page 7).

Thus, while the claimant had some depression in the month following the death of her niece, for whom the claimant worked as a caretaker, her condition was stable since then, with numerous findings of normal mental status.

The claimant's medically determinable mental impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere.

In making this finding, the undersigned has considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

Thus, based on the overall evidence, the undersigned finds that in understanding, remembering, or applying information, the claimant has mild limitations. In the claimant's initial function report, the claimant indicated she could follow both written and spoken "fine," with "no issues" (Exhibit 6E). She does not need special reminders to take medication (Exhibit 5E). Memory was noted to be unimpaired on January 3, 2021 (Exhibit 1F). On August 2, 2021, she was able to provide an adequate history (Exhibit 5F). She is able to drive a car (Exhibit 6E). The claimant is consistently noted to be alert and oriented. The claimant's memory is consistently intact. Generally, the claimant's treating providers have not indicated that the claimant has difficulty understanding and maintaining conversation in the treatment setting. The claimant attended the hearing and answered questions appropriately, there was no evidence of apparent difficulties understanding and attending to the content of the hearing. Overall, the weight of the evidence is consistent with the claimant having at most mild limitations.

In interacting with others, the claimant has mild limitations. She attends church (Exhibit 6E), dines in restaurants, and attends family gatherings (Exhibit 5E). On August 2, 2021, she was very pleasant and cooperative (Exhibit 5F). In the initial function report, the claimant reported that she has no problems getting along with family, friends, neighbors, or others (Exhibit 6E). The claimant was polite and appropriate at the hearing, responding to questions adequately and cooperatively. The undersigned

finds that the weight of the evidence supports "mild" difficulties interacting with others as this domain is defined in the regulations.

With regard to concentrating, persisting, or maintaining pace, the claimant has mild limitations. Attention and concentration were unimpaired on January 3, 2021 (Exhibit 1F). The claimant's treatment notes show that she maintains concentration and persistence to manage daily tasks and she told the consultative examiner that she can maintain personal hygiene. The claimant is able to drive a vehicle and use public transportation independently. Further, the claimant's treating providers do not indicate the claimant evinces deficits maintaining pace. Therefore, the overall evidence supports at most "mild" restriction concentrating, persisting, or maintaining pace, as this domain is defined and discussed in the regulations.

As for adapting or managing oneself, the claimant has experienced mild limitations. In the initial function report, the claimant drives, shops and goes out alone (Exhibit 6E). She does not need special reminders to perform self-care (Exhibit 5E). The claimant can pay bills, count change, and use a checkbook (Exhibit 6E). She was able to provide care for a paraplegic niece until her death (Exhibit 5E). The undersigned finds the weight of the evidence is consistent with mild limitations in adapting or managing oneself.

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, it is nonsevere (20 CFR 404.1520a(d)(1)).

CAR 31-33.

Plaintiff argues the ALJ erred by noting that Dr. Mitchell's evaluation occurred in January 2021 – very shortly after Plaintiff's niece died in December 2020 – when Dr. Mitchell's evaluation actually occurred in January 2022. See ECF No. 15, pgs. 23-26. As discussed below, Plaintiff also argues that the ALJ erred in rejecting Dr. Mitchell's opinions at Step 4. See id.

Plaintiff's argument is well-taken. Dr. Mitchell's report is contained within the record at Exhibit 1F. See CAR 287-94. The report indicates that Dr. Mitchell examined Plaintiff on January 3, 2021. See id. at 287. On January 11, 2022, the agency determined that the date on Dr. Mitchell's report was incorrect and that a new report with the correct examination date of January 3, 2022, would be needed. See CAR 102. Dr. Mitchell was contacted and agreed to provide the agency with a corrected report that say day. See id. Based on the discussion in the hearing decision, outlined above, it appears that the ALJ failed to notice this discrepancy given the continued reference to the incorrect date of the examination, which the ALJ stated occurred

8

1    one week after Plaintiff's niece died.

2              Regardless of this error, the Court finds that the ALJ's analysis at Step 2 fails to

3    account for Dr. Mitchell's opinions.  In the report at Exhibit 1F, Dr. Mitchell opined that Plaintiff

4    is "[n]ot to moderately" impaired in the ability to adapt to the usual stresses common to a

5    competitive work environment.  See CAR 293.  Dr. Mitchell further opined that this impairment

6    would cause Plaintiff to have difficulty completing a normal workday or workweek and

7    responding appropriately to changes in a work setting.  See id.  Dr. Mitchell also opined that

8    Plaintiff is "[m]ild to moderately" impaired in her ability to complete a normal workday or

9    workweek without interruptions resulting from a psychiatric condition.  See id.

10             While the ALJ acknowledged these opinions, the ALJ also found that Plaintiff's

11    mental impairment was non-severe.  The Court does not agree with this conclusion.  An

12    impairment may only be considered non-severe if the evidence shows no more than a minimal

13    impact on the claimant's ability to perform work-related activities.  Here, Dr. Mitchell's opinion

14    constitutes evidence of moderate limitations in Plaintiff's ability to complete a normal workday or

15    workweek.  Thus, Plaintiff met her burden at Step 2 of pointing to evidence showing more than a

16    minimal impact on her ability to work.

17             The ALJ's error at Step 2, however, is harmless because the ALJ nonetheless

18    evaluated Dr. Mitchell's opinions at Step 4 when determining Plaintiff's mental residual

19    functional capacity.  See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007).  Whether the ALJ

20    erred at Step 4 with respect to Dr. Mitchell's opinion is discussed below.

21         **B.**    **Evaluation of Medical Opinion Evidence**

22             "The ALJ must consider all medical opinion evidence."  Tommasetti v. Astrue,

23    533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).  The ALJ errs by not

24    explicitly rejecting a medical opinion.  See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir.

25    2014).  The ALJ also errs by failing to set forth sufficient reasons for crediting one medical

26    opinion over another.  See id.

27    / / /

28    / / /

Under the regulations, only "licensed physicians and certain qualified specialists" are considered acceptable medical sources.  20 C.F.R. § 404.1513(a); see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).  Where the acceptable medical source opinion is based on an examination, the ". . . physician's opinion alone constitutes substantial evidence, because it rests on his own independent examination of the claimant."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The opinions of non-examining professionals may also constitute substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  Social workers are not considered an acceptable medical source.  See Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1223-24 (9th Cir. 2010).  Nurse practitioners and physician assistants also are not acceptable medical sources.  See Dale v. Colvin, 823 F.3d 941, 943 (9th Cir. 2016).  Opinions from "other sources" such as nurse practitioners, physician assistants, and social workers may be discounted provided the ALJ provides reasons germane to each source for doing so.  See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017), but see Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(f)(1) and describing circumstance when opinions from "other sources" may be considered acceptable medical opinions).

The Commissioner has promulgated revised regulations concerning how ALJs must evaluate medical opinions for claims filed, as here, on or after March 27, 2017.  See 20 C.F.R. §§ 404.1520c, 416.920c.  These regulations supersede prior caselaw establishing the treating physician rule which established a hierarchy of weight to be given medical opinions depending on their source.  See id.; see also Jones v. Saul, 2021 WL 620475, at *9 (E.D. Cal. Feb. 17, 2021) ("In sum, because (1) the 2017 regulations are not arbitrary and capricious or manifestly contrary to statute, (2) the prior judicial construction was not mandated by the governing statutory language to the exclusion of a differing agency interpretation, and (3) the [treating-physician rule] is inconsistent with the new regulation, the court concludes that the 2017 regulations effectively displace or override [prior caselaw.]").  Thus, ALJs are no longer required to "defer to or give any specific evidentiary weight to" treating physicians over medical opinions from other sources.  See Carr v. Comm'r of Soc. Sec., 2021 WL 1721692, at *7 (E.D. Cal. Apr.

1   30, 2021).

2           Under the revised regulations, the ALJ must evaluate opinions and prior

3   administrative medical findings by considering their "persuasiveness."  See Buethe v. Comm'r of

4   Soc. Sec., 2021 WL 1966202, at *3 (E.D. Cal, May 17, 2021) (citing 20 C.F.R. § 404.1520c(a)).

5   In determining how persuasive the opinion of a medical source is, an ALJ must consider the

6   following factors:  supportability, consistency, treatment relationship, specialization, and "other

7   factors."  See Buethe, 2021 WL 1966202, at *3 (citing § 404.1520c(b), (c)(1)-(5)).  Despite a

8   requirement to consider all factors, the ALJ's duty to articulate a rationale for each factor varies.

9   See Buethe, 2021 WL 1966202, at *3 (citing § 404.1520c(a)-(b)).

10          Specifically, in all cases the ALJ must at least "explain how [she] considered the

11  supportability and consistency factors," as they are "the most important factors." See Buethe,

12  2021 WL 1966202, at *4 (citing § 404.1520c(b)(2)).  For supportability, the regulations state:

13  "[t]he more relevant the objective medical evidence and supporting explanations presented by a

14  medical source are to support his or her medical opinion(s) or prior administrative medical

15  finding(s), the more persuasive [the opinion] will be."  See Buethe, 2021 WL 1966202, at *4

16  (quoting § 404.1520c(c)(1)).  "For consistency, the regulations state: '[t]he more consistent a

17  medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

18  medical sources and nonmedical sources in the claim, the more persuasive [the opinion] will be.'"

19  Buethe, 2021 WL 1966202, at *4 (quoting § 404.1520c(c)(2)).  "The ALJ is required to articulate

20  findings on the remaining factors (relationship with claimant, specialization, and 'other') only

21  when 'two or more medical opinions or prior administrative medical findings about the same

22  issue' are 'not exactly the same,' and both are 'equally well-supported [and] consistent with the

23  record.'"  Buethe, 2021 WL 1966202, at *4 (quoting § 404.1520c(b)(2) & (3)).

24          At Step 4, the ALJ considered the medical opinion evidence of record from a

25  number of sources, including Dr. Wagner, an agency consultative examining physician, who

26  opined that Plaintiff can perform medium work.  See CAR 40-41.  Though Plaintiff's mental

27  impairment was found to be non-severe at Step 2, the ALJ also discussed at Step 4 opinions

28  rendered by Dr. Mitchell, a consultative examining psychologist.  See id.  Plaintiff argues the ALJ

1    erred with respect to Drs. Wagner and Mitchell.  See ECF No. 15.

2                  1.    Dr. Wagner

3           Regarding Dr. Wagner, the ALJ stated:

4           On August 2, 2021, Dr. Wagner conducted an internal medicine
            evaluation of the claimant (Exhibit 5F). She reported diffuse, mild
5           arthralgias in the feet, hips and low back. She reported low back pain and
            said she could walk 4-6 blocks and sit for 45 minutes. She complained of
6           heightened sensitivity to "everything" due to fibromyalgia, and that it felt
            like she ran a marathon every day. She cooks, cleans, drives, shops,
7           performs her own activities of daily living, walks and does yoga for
            exercise. Upon physical examination, she was easily able to get out of the
8           chair and walk at a normal speed. She sat comfortably. She could heel and
            toe walk. Examination of the knees revealed no redness, heat, swelling,
9           tenderness, effusions, ligamentous laxity or crepitus. Mild tenderness over
            the trochanter bursae of both hips was present. Hand exam revealed good
10          dexterity. She was able to oppose fingertips to thumb tips. She had some
            very minimal Heberden's nodules at a few of the distal interphalangeal
11          joints and very minimal contracture at a few of the distal interphalangeal
            joints, otherwise joints showed no redness, heat, enlargement, swelling or
12          tenderness. She had minimal psoriasis on the elbows but nowhere else.
            She had 5/5 strength in all extremities, including grip. She had normal
13          bulk and tone with no atrophy. Sensation was intact. The impression was
            psoriatic arthritis with no observable psoriasis, low back pain, and
14          fibromyalgia. He opined she could perform medium work with frequent
            climbing, stooping, and crouching.
15
                              * * *
16
            . . . Regarding her hands, Dr. Wagner noted no synovitis was present and
17          she demonstrated good hand dexterity with an ability to oppose her
            fingertips to thumb tips. While she had some very minimal Heberden's
18          nodules at a few of the distal interphalangeal joints and very minimal
            contracture at a few of the distal interphalangeal joints, her joints
19          otherwise showed no redness, heat, enlargement, swelling or tenderness
            and she had 5/5 grip strength. Thus, the limitation to frequently handling
20          items with the hands is appropriate.

21                            * * *

22          Dr. Wagner attributed her mild symptoms to early arthritis, her back pain
            to a strain and her fibromyalgia supported by few findings. He opined that
23          given her minimal psoriatic arthritis symptoms and normal physical exam,
            she could perform medium work (Exhibit 5F).
24
            CAR 37-40.
25

26   / / /

27   / / /

28   / / /

                                    12

1    Plaintiff argues the ALJ erred in relying on Dr. Wagner's opinion.  See ECF No.

2    15, pgs. 17-18.  According to Plaintiff:

3         Most notably, the ALJ failed to explain why Dr. Wagner's opinion
          is consistent (or inconsistent) with probative evidence in the treatment
4         notes of Plaintiff's treating physicians. 20 C.F.R. § 404.1520c(c)(2)
          (consistency factor). These records show Plaintiff had pre-existing
5         impairments, e.g., psoriatic arthritic, fibromyalgia, the symptoms of which
          varied over time but overall worsened before and after her alleged onset
6         date. By the time she stopped working, she was already taking several
          high-risk drugs (immunosuppressant, injected steroids and biologicals),
7         but her conditions worsened, and her rheumatologist (Dr. Swe) added
          Gapapentin (anti-convulsant) for her worsening fibromyalgia (Tr. 01/21)
8         and oral Prednisone (steroid) for her worsening psoriatic arthritis (04/21)
          (Tr. 301, 307). The ALJ failed to address whether Dr. Wagner's opinion is
9         consistent with the positive findings (e.g., limited ranges of motion)
          recorded in Dr. Chin's primary care treatment notes in March, May and
10        August 2021 (Tr. 495, 502, 505). Nor did the ALJ address whether Dr.
          Wagner's opinion is consistent with Dr. Chin's opinions that Plaintiff was
11        disabled because of her "persistent arthralgias," she was "[u]nable to
          work due to multiple joint pains" and she should apply for permanent
12        disability (Tr. 502, 505). Neither did the ALJ explain whether Dr.
          Wagner's opinion is consistent with the positive clinical signs observed by
13        Dr. Swe over time, such as multiple fibromyalgic tender points, tenderness
          in Plaintiff's hips, shoulders and wrists and tenderness and swelling in her
14        finger joints (Tr. 304, 310, 440, 539, 548, 588). The ALJ's failure to
          explain why he rejected this evidence is error, as is the ALJ's failure to
15        articulate his consideration of the consistency factor when evaluating Dr.
          Wagner's opinion.
16        The ALJ cited a number of Dr. Wagner's examination findings,
          which implicates the supportibility factor (Tr. 37-38). 20 C.F.R. §
17        404.1520c(c)(1) (supportibility factor). However, Dr. Wagner's report
          does not indicate whether he examined Plaintiff for tender points and he
18        expressed doubt that she even had fibromyalgia (Tr. 481). Moreover, Dr.
          Wagner did not review any of Plaintiff's treatment notes that reflect her
19        diagnoses of and treatment for fibromyalgia and psoriatic arthritis and
          other impairments (Tr. 477). Therefore, his report is of limited probative
20        value and the ALJ's reliance thereon is error.

21        ECF No. 15, pgs. 17-18.

22        Plaintiff's argument is not persuasive.  Contrary to Plaintiff's assertion, Dr.

23   Wagner did in fact examine Plaintiff for tender points indicative of fibromyalgia.  Dr. Wagner's

24   report is contained in the record at Exhibit 5F.  See CAR 477-81.  On physical examination, Dr.

25   Wagner noted that Plaintiff's abdomen was nontender.  See id. at 479.  Dr. Wagner also observed

26   no tenderness in Plaintiff's knees, though some mild tenderness was observed over the trochanter

27   bursae of both hips.  See id. at 480.  Plaintiff's hand joints also exhibited no tenderness.  See id.

28   Sensory exam was also "grossly intact" to light touch and pinprick throughout the bilateral upper

13

and lower extremities.  See id.  Dr. Wagner diagnosed Plaintiff with fibromyalgia based largely

on Plaintiff's subjective report and noted that Plaintiff "has. . . a few typical findings of

fibromyalgia," but the doctor questioned if Plaintiff meets the diagnostic criteria.  See id. at 481.

Given the objective findings, the Court concludes that Dr. Wagner's opinion is adequately

supported.

As to consistency with Dr. Chin's findings, the Court finds it illustrative that

Plaintiff does not challenge the ALJ's rejection of Dr. Chin's opinions.  While Plaintiff is correct

that the ALJ did not specifically comment on whether Dr. Wagner's opinions were consistent

with Dr. Chin's, the record clearly demonstrates that they are not.  Dr. Chin's records are

contained at Exhibit 6F.  See CAR 484-531.  In 2021 Dr. Chin observed a few tender points on

physical examination and recommended an extension of Plaintiff's temporary disability which

started in December 2020 following her niece's death.  See id. at 19.  The ALJ gave no weight to

Dr. Chin's findings, concluding that "there is insufficient explanation as to what they were based

on, and they were clearly meant to be short term."  CAR 40.  Again, it is noteworthy that Plaintiff

does not raise any arguments as to the ALJ's evaluation of Dr. Chin's opinion.

Plaintiff also does not discuss the ALJ's evaluation of opinions provided by Drs.

Jackson and Nasrabadi, both agency reviewing physicians, who concluded that Plaintiff is able to

perform medium work.  See CAR 41.  While the ALJ found that some work-related restrictions

were appropriate, the ALJ otherwise gave significant weight to these opinions, which are

consistent with the opinion rendered by Dr. Wagner, who examined Plaintiff.

Given the record as a whole, the Court finds that the ALJ's evaluation of Dr.

Wagner's opinion is sound.  Dr. Wagner's opinion is supported by the doctor's own objective

findings on examination and is consistent with similar opinions rendered by the agency reviewing

physicians.

/ / /

/ / /

/ / /

/ / /

1          2.      Dr. Mitchell

2          As to Dr. Mitchell, the ALJ stated as follows at Step 4:

3          Dr. Mitchell, the consultative examiner who evaluated the claimant on
           January 3, 2021, felt that she may have difficulty managing stress and
4          change in the workplace based on her level of depression and anxiety, and
           that she was mild to moderately impaired in the ability to complete a
5          normal workday/week without interruptions from a psychiatric condition
           due to anxiety and depression and her report of being uncomfortable
6          around others (Exhibit 1F). This opinion is not persuasive. It was rendered
           just one week after the claimant was treated for bereavement, following
7          the death of the niece that she was providing in home care for.
           Additionally, other than the doctor noting that she appeared anxious and
8          depressed, mental status findings were essentially normal. She was
           cooperative. Eye contact was good. Speech was normal. She was oriented
9          in all spheres. Attention and concentration were not impaired. Memory
           was not impaired abstraction and judgment were intact and she had good
10         insight. She was noted to be anxious and depressed. Thought processes
           were linear and logical. Subsequent treatment evidence also indicates
11         normal mental status findings, as summarized above. The overall
           evidence is not supportive of the doctor's conclusions regarding mild to
12         moderate impairment in the ability to complete a normal workday/week
           without interruptions from a psychiatric condition due to anxiety and
13         depression and her report of being uncomfortable around others. His
           opinion that she "may have difficulty managing stress" is speculative and
14         inconsistent with his findings and the overall evidence.

15         CAR 40.

16         Here, the ALJ provided two reasons for finding Dr. Mitchell's opinions

17 unpersuasive.  First, the ALJ noted that the doctor's evaluation occurred one week following the

18 death of Plaintiff's niece.  Based on this, the ALJ appears to have concluded that any limitations

19 opined by Dr. Mitchell were due to bereavement and not a psychological condition.  Second, the

20 ALJ noted that Dr. Mitchell's assessment that Plaintiff is moderately limited in her ability to

21 complete a normal workday or workweek is not supported by the doctor's own findings on

22 objective examination.  As discussed above, the ALJ erred in stating that Dr. Mitchell's

23 examination occurred one week following the death of Plaintiff's niece because the examination

24 actually occurred in January 2022, not January 2021.

25         The ALJ's second reason, however, is valid and supported by the record.  In

26 evaluating medical opinions under the revised regulations, the ALJ must consider supportability.

27 The more a doctor's opinion is supported by the objective findings, the more persuasive that

28 opinion is.  Here, the Court agrees with the ALJ that Dr. Mitchell's opinion of moderate

1   limitation is not supported by the doctor's own objective findings.  On mental status exam, Dr.

2   Mitchell noted that Plaintiff's attitude was cooperative and on-task, Plaintiff's posture and gait

3   were observed to be normal, Plaintiff made good eye contact, speech was coherent, Plaintiff was

4   oriented in all spheres, Plaintiff's attention was not impaired, Plaintiff's concentration was not

5   impaired, Plaintiff had a normal fund of knowledge, Plaintiff's memory was not impaired,

6   Plaintiff's judgment was intact, insight was good, and Plaintiff's thought process was intact,

7   linear, and logical.  See CAR 289-90 (Exhibit 1F).  Dr. Mitchell also administered the MMSE test

8   for cognitive impairment and recorded that Plaintiff scored 29 out of 30, indicating "effectively

9   normal" cognition.  See id. at 291.

10          **C.**    **Evaluation of Plaintiff's Subjective Statements and Testimony**

11          The Commissioner determines the weight to be given to a claimant's own

12   statements and testimony, and the Court defers to the Commissioner's discretion if the

13   Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94

14   F.3d 520, 522 (9th Cir. 1996).  An explicit finding must be supported by specific, cogent reasons.

15   See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.

16   See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify

17   what testimony is not afforded weight and what evidence undermines the testimony.  See id.

18   Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's

19   reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also

20   Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue,

21   504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

22          If there is objective medical evidence of an underlying impairment, the

23   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

24   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

25   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

26               The claimant need not produce objective medical evidence of the
              [symptom] itself, or the severity thereof.  Nor must the claimant produce

27            objective medical evidence of the causal relationship between the
              medically determinable impairment and the symptom.  By requiring that

28            the medical impairment "could reasonably be expected to produce" pain or

another symptom, the <u>Cotton</u> test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in <u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  <u>See</u> <u>Bunnell</u>, 947 F.2d at 345-47.  In weighing a claimant's statements and testimony, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  <u>See</u> <u>Smolen</u>, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  <u>See</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  <u>See</u> <u>Carmickle</u>, 533 F.3d at 1161 (citing <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989)).

At Step 4, the ALJ evaluated Plaintiff's subjective statements and testimony in determining her residual functional capacity.  <u>See</u> CAR 35-40.  The ALJ summarized Plaintiff's statements and testimony as follows:

At the hearing on June 28, 2022, the claimant testified that the biggest impairments that prevents her from working are psoriatic arthritis and fibromyalgia. She has had fibromyalgia for six years and was diagnosed five years ago. It has gotten worse over the years, and her medication was increased. She has constant back, neck and shoulder pain from fibromyalgia, occurring 24 hours a day. It is worse in her low back where she received cortisone shots every two months and takes Gabapentin daily. After taking Gabapentin, or receiving injections, her pain is a 7/10. Medications helped partially. It gives her one month and a half of relief from sharp pain and is the only thing that takes the swelling down. She lays down with her feet up. Activity makes her fibromyalgia worse. It is constantly painful, and she cannot be touched. It is painful when people hug her too hard. She complained of constant flares of pain, but then changed her testimony to monthly or every other month. The flares last three to four days, during which she lays down. She sees a doctor every two months and sleeps five to six hours a night.

She received shoulder injections and experiences "bad" sciatica once every couple of months. She can use her hands for 15 minutes before resting them for one hour. She has trouble reaching forward due to shoulder pain. Her doctor ordered blood lab testing, but rheumatoid arthritis results were negative. Medication side effects consist of weakness, tiredness, and mainly fatigue. She naps during the day for two to three hours. Her psoriatic arthritis affects her neck, knees, ankles and back. It is very painful and stops her from doing daily activities. She has skin lesions that reoccur on her hands, elbows, under her breasts and on her knees. She treats them with topical ointment and several medications which do not really help with the pain. The pain is worse in her feet, knees, low back and hands. She uses a cane occasionally that she bought at Wal-Mart. Her doctor does not know about it, as she just bought it three weeks earlier as she was having trouble walking. She just signed up for physical therapy.

She stretches, lays down, and takes Ibuprofen. She can sit up to thirty minutes before experiencing stiffness in her joints. She must change positions once for 15-20 minutes. She can stand up to 30 minutes before sitting down for an hour and walk for 30-40 minutes. She can lift up to 12 pounds. She uses ice and heat three times a week. She can bathe, groom, dress and toilet herself. On a typical day, she gets up at six, makes a cup of coffee, sits on the couch, showers, and sits around the rest of the day. She spends most of the time off her feet. She spends three or f[our h]ours laying down or with her feet up. She unloads the dish washer and cooks dinner. She washes clothes, wipes the bathrooms down. She does not mop, vacuum or sweep. She goes to doctor's appointments, the grocery store, and out to dinner occasionally. It takes her longer to do these activities, including getting dressed. Her daughter has to take her grocery shopping because she cannot handle it alone. She does not go to church, grocery stores, or women's bible study and social events, and avoids socializing with non-family members. Her hobby is doing puzzle books and word search; she does these to try and control her mind. She spends an hour a day on the Internet. She socializes with her children and sisters. She travels to Reno occasionally for meetings with her husband. She cannot sit in the car that long and has to stop for rest breaks or lay down in the back seat. She also takes extra pain pills on these strips. If she tried to work eight hours a day, she could not last for eight hours, because she cannot sit or stand, and she needs to sit when she needs to and stand for a few minutes and would not be able to walk as it's too painful. She cannot function outside her house very well without assistance from her kids, and she is in pain constantly.

CAR 35-36.

/ / /

/ / /

/ / /

/ / /

/ / /

18

The ALJ found Plaintiff's statements and testimony "not entirely consistent with the medical evidence and other evidence in the record." Id. at 36.  The ALJ then engaged in a lengthy discussion of the objective medical findings, which the Court does not repeat here.  See id. at 36-39.  The ALJ then stated:

> Thus, the claimant has been treated for psoriatic arthritis and fibromyalgia, with findings of tender points and limitation in range of motion. Given her severe impairments, as well as her non-severe obesity, a limitation to the light residual functional capacity determination adopted herein is appropriate. Additionally, she has slightly reduced range of motion of her shoulders, and thus a limitation to frequent reaching is appropriate. Regarding her hands, Dr. Wagner noted no synovitis was present and she demonstrated good hand dexterity with an ability to oppose her fingertips to thumb tips. While she had some very minimal Heberden's nodules at a few of the distal interphalangeal joints and very minimal contracture at a few of the distal interphalangeal joints, her joints otherwise showed no redness, heat, enlargement, swelling or tenderness and she had 5/5 grip strength. Thus, the limitation to frequently handling items with the hands is appropriate.
>
> However, further functional restrictions are not supported. Despite her reports of constant, 24 hour a day pain, chart notes consistently note that she was in no acute distress. While she claims she used a cane due to trouble walking, she consistently is noted to have normal gait. She has been noted to be able to rise from sitting position without assistance and had 5/5 strength in upper and lower extremities, suggesting that she retains more functional ability than alleged (Exhibit 5F). While she testified that she has side effects of medication, there is no indication of such reports to treating providers. While she claims tiredness and fatigue, with limited ability to lift, sit, stand or walk, she does not have atrophy and she her post onset date activities have included performing self-care, driving, shopping, going to Reno, preparing meals, doing the laundry, and goes for walks and does yoga. This suggests that the claimant's allegations of more significant physical limitations than found herein are overstated. Accordingly, she is not more limited than found herein.
>
> The claimant is a 52-year-old woman who alleges disability due to fibromyalgia with chronic severe multiple joint pain and weakness and psoriatic arthritis manifested by painful skin lesions involving her neck, back, and upper and lower extremities. However, medical records show that she does not have much swelling, no synovitis, slightly limited range of motion deficits, no atrophy, a normal gait and negative sensory testing. Imaging studies of the back were mild and her psoriatic arthritis was stable (Exhibit 6F and 9F). In addition, she has responded well to medication, laboratory tests are unremarkable, and the cane was bought just three weeks prior to the hearing on her own. She drives, cooks, drove to Reno, shops, dines in restaurants, does the laundry and dishes and handles her own personal appearance. She was able to work for years in spite of her fibromyalgia.
>
> CAR 39-40.

Plaintiff primarily argues that the ALJ erred in relying on activities of daily living to reject her statements and testimony.  See ECF No. 15, pgs. 20-21.  Plaintiff further argues that the ALJ's "other reasons will also fail the clear and convincing standard of review."  Id. at 21-22.

### 1.   Activities of Daily Living

Regarding reliance on a claimant's daily activities to discount testimony of disabling pain, the Social Security Act does not require that disability claimants be utterly incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . . does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the claimant was entitled to benefits based on constant leg and back pain despite the claimant's ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication").   Daily activities must be such that they show that the claimant is ". . .able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard before relying on daily activities to discount a claimant's pain testimony.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

Plaintiff cites Burrell v. Colvin, 775 F.3d 1133, 1138 (9th Cir. 2014), and argues that the ALJ's discussion of her daily activities is inadequate because "the ALJ failed to identify *which* part of Plaintiff's testimony was contradicted by *which* of her activities."  ECF No. 15, pg. 20.  This argument is not persuasive.  The ALJ specifically noted that all of Plaintiff's combined daily activities, such as performing self-care, driving, shopping, going to Reno, preparing meals, doing laundry, going for walks, and doing yoga, suggest that Plaintiff's statements of disabling

physical limitations are overstated.  In doing so the ALJ provided an adequate link between daily activities and Plaintiff's testimony of disabling physical limitations.

Plaintiff also argues that the ALJ erred by not considering the limited nature of her daily activities.  See ECF No. 15 pgs. 20-21.  As outlined above, reliance on daily activities is misplaced unless such activities show that the claimant can spend most of the day engaged in activities which can be transferred to a work setting.  The ALJ must make specific findings in this regard.

Plaintiff's argument regarding the limited nature of her daily activities is more persuasive.  As the ALJ noted in the hearing decision, Plaintiff's activities of daily living, while varied, are quite limited.  For example, Plaintiff must shift positions frequently when sitting and can only sit for about 30 minutes.  Plaintiff can walk for only 30-40 minutes at a time.  She spends most of her day off her feet and spend three or four hours a day lying down with her feet up.  She cannot mop, vacuum, or sweep.  She only goes out occasionally.  Plaintiff stated that her daughter must assist her with grocery shopping.  As to traveling to Reno, Plaintiff testified that she only does this occasionally and, when she does, she goes with her husband, and they must stop to allow Plaintiff to rest or lay down in the back seat.  Plaintiff also stated that she takes additional pain pills when on these trips.  Generally, Plaintiff stated that she cannot function outside the home without assistance from her family.

These limitations do not suggest that Plaintiff is capable of daily activities which are transferrable to full-time competitive work.  As such, the ALJ's reliance on Plaintiff's daily activities is misplaced and would require remand in the absence of other valid reasons to discount Plaintiff's statements and testimony.

2.     Other Reasons

According to Plaintiff:

> The ALJ's other reasons will also fail the clear and convincing standard of review. The ALJ rejected Plaintiff's testimony of medication side effects because there is no indication in the record that she made such reports to her physicians (Tr. 39). However, on at least one occasion, Plaintiff told her primary care physician that her medications made her tired and sleepy during the daytime (Tr. 501). While it is true Plaintiff's

fibromyalgia also caused fatigue, she apparently was able to attribute her fatigue, at least in part, to taking her medications (Tr. 66). The ALJ also rejected Plaintiff's testimony based on her recent acquisition of a cane, finding she was consistently noted to have a normal gait (Tr. 39). However, Plaintiff has never claimed she was disabled because she was unable to effectively ambulate and the ALJ did not ask her at her hearing why she was having trouble with walking (Tr. 56, 64). The ALJ also selectively cited the medical records, i.e., Plaintiff consistently appeared to be "in no acute distress" and "she does not have atrophy," but failed to explain the significance of these findings in light of other clinical findings in Plaintiff's treatment records, such as reduced ranges of motion and tender points (Tr. 39). . . .

ECF No. 15, pgs. 21-22.

Plaintiff's argument is unpersuasive.  Notably, Plaintiff does not discuss a key finding made by the ALJ – that Plaintiff was able to work for several years prior to the alleged onset date despite fibromyalgia which Plaintiff now claims is disabling.  The record reflects that Plaintiff stopped working in December 2020 shortly after the death of her niece, but that she had worked prior to that time even though she was first diagnosed with fibromyalgia years before. See CAR 103, 508.  From 2004 to December 2020, Plaintiff worked as an in-home care provider. See id. at 211.  On December 24, 2020, Plaintiff's treating physician noted that Plaintiff could not take on another caretaking job following the death of her niece and that Plaintiff "wants disability."  Id. at 508.  As Defendant notes, the doctor did not indicate that Plaintiff's inability to work was due to any physical symptoms.  See id.

The fact that Plaintiff has had fibromyalgia prior to the alleged onset date and could work despite that condition prior to the alleged onset date provides an adequate basis for the ALJ to reject Plaintiff's testimony of disabling fibromyalgia post-onset date.  Thus, despite the ALJ's misplaced citation to Plaintiff's activities of daily living, the Court finds that the ALJ's evaluation of Plaintiff's subjective statements and testimony is nonetheless legally sound and based on some evidence in the record as a whole.

/ / /

/ / /

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.  CONCLUSION

Based on the foregoing, the Court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED as follows:

1.      Plaintiff's motion for summary judgment, ECF No. 15, is DENIED.

2.      Defendant's motion for summary judgment, ECF No. 18, is GRANTED.

3.      The Commissioner's final decision is AFFIRMED.

4.      The Clerk of the Court is directed to enter judgment and close this file.

Dated:  July 22, 2024

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

23